IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

OSCAR JOSE GARZA,                  §
                                   §
            Plaintiff,             §
                                   §
VS.                                §   CIVIL ACTION H-09-4058
                                   §
HARRIS COUNTY, TEXAS,              §
                                   §
            Defendant.             §

## OPINION AND ORDER OF SUMMARY JUDGMENT

The above referenced action seeks compensatory and exemplary damages for the alleged violation of Plaintiff Oscar Jose Garza's ("Garza's") civil and constitutional right as a pre-trial detainee to medical care, grounded in 42 U.S.C. § 1983 and the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and in negligence and gross negligence under Texas State law.   Pending before the Court is Defendant Harris County, Texas's ("Harris County's") motion for summary judgment (instrument #13).

## I.  Factual Allegations

According to the complaint (#1), on December 27, 2007 Garza was arrested and charged with Drinking While Intoxicated ("DWI") in Harris County, Texas.   Because it was his third offense and therefore a felony DWI, he was initially taken into custody by the Harris County Sheriff's Office and housed in the 1200 Baker Street jail.   At his screening examination upon arrival, Garza related a

-1-

history of high blood pressure since approximately 2001 and informed jail personnel that he had suffered a stroke some years before his arrest, but had recovered.  On arrival his blood pressure was 182/100, and continued to be high for several days, so he was prescribed medication, including Clonidine, HCTZ, Catapril and aspirin, which soon controlled the problem.  He remained at the jail for approximately nine weeks, but during that time he claims that he received his medication only on an irregular basis.

Subsequently Garza was transferred to the Harris County Jail Facility at 701 N. San Jacinto Street in Houston, Texas ("701 jail").  There he claims that he received no medications, allegedly because his name was left off the list of inmates who required medication.  Garza informed the staff at the 701 jail, but nothing was done to resume his blood pressure medication on a regular basis.  A note made by a nurse with the Harris County Sheriff's Office indicated that on March 10, 2008 his blood pressure was 194/134 and that he had not had medication for that condition for at least two days because of his transfer.  On the evening of March 11, 2008 Garza became dizzy and fell off his bunk in his cell; he had a grand mal seizure and was admitted to LBJ Hospital early in the morning of March 12, 2008 with a blood pressure reading of 156/113.  He was treated with intravenous medication, which lowered his blood pressure so that he could be transferred to Ben Taub Hospital.  On admission to Ben Taub, he was lethargic but able to

be aroused, his blood pressure was measured at 113/76 and his pulse at 55, and he had no strength, no sensation and a decreased muscle tone in his left upper and lower extremity.  His left side suffered decreased muscle reflexes, facial paralysis, and a positive Babinski sign, and plus paralysis of the left trapezius muscle.  A CT scan of his head revealed a large right-sided brain hemorrhage (right basal ganglia).  Garza asserts that because he had been denied his required blood pressure medication, he suffered an Intracerebral Hemorrhage, i.e., a stroke.  He now suffers from the effects of that stroke, including significant left sided motor weakness and deficiencies in attention and memory, and he has a relatively poor prognosis.[1]

Garza charges that his stroke was caused by uncontrolled blood pressure due to denial of his medication and by the continued administration of aspirin, which he asserts is only indicated for patients with "infarct" strokes, not hemorrhagic strokes associated with high blood pressure.

The complaint further asserts that the individuals who staffed

---

[1] It should be noted that Garza's own deposition, submitted as evidence by Harris County, contradicts some of his complaint's key allegations as well as the medical doctor's affidavit that he submits as his own summary judgment evidence.  For example during his deposition he claimed that he did not receive any blood pressure medicine in Harris County Jail after he was booked on December 27, 2007 until the end of February (#13-1, Ex. A at 82-85), that he did not see a doctor in the month of December 2007 at the jail (*id.* at 86-87), and that the stroke he suffered on March 10, 2007 was his first stroke (*id.* at 95).

the two jails in which Garza was housed (deputies, jailers and medical personnel) were employed by Harris County and acted as agents and employees of the County.  The individual jailers and the medical personnel were acting under color of state law in their official capacities and were under the direct supervision and control of Harris County.  He claims that they were negligent and grossly negligent in failing to provide for his safety and welfare and that their acts constituted a deliberate, malicious, callous, and reckless indifference to Garza's rights and physical safety.

Garza claims that Harris County failed to properly supervise, train, and manage the individual employees involved in Garza's treatment in jail and that this failure was a direct and proximate cause of his injuries.  He also asserts Harris County was negligent in failing to implement a policy regarding appropriate administration of, and monitoring of the administration of, medication and in failing to properly train jail staff regarding appropriate delivery and monitoring of required medication and detainees' health conditions.  He alleges that Harris County negligently implemented and ratified inadequate policies and procedures concerning the treatment of detainees with specific medical needs that required continual administration of medication and monitoring of their medical condition.  Moreover the County had a custom, usage, procedure, pattern, practice or policy that encouraged, condoned, and permitted its jail staff to ignore the

-4-

medical needs of detainees and prisoners, to fail to distribute medications at appropriate intervals, and to leave medical decisions about dispensing medication to untrained jailers rather than medical staff. Harris County participated in or became aware of, had actual and constructive knowledge of, the calculated and systematic violations of citizens' rights by the individuals staffing its jails.

## II.  Standard of Review

The Court notes that Plaintiff is no longer in detention and is represented by counsel in this suit.

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A dispute of "material" fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Initially the movant bears the burden of identifying those portions of the pleadings and discovery in the record that it finds demonstrate the absence of a genuine issue of material fact; the movant may, but is not required to, negate elements of the nonmovant's case to prevail on summary judgment.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause of action(s). *Morris v. Covan World Wide Moving, Inc,*, 144 F.3d 377, 380 (5th Cir. 1998). Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State*

*Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986).  "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252.  The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'"  *Id.*, *quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986).   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S.  at 322, and *Liberty Lobby*, 477 U.S. at 249-50.[2]

### III.  Relevant Substantive Law

As a matter of law, a number of Plaintiff's claims are not cognizable and must be dismissed, as indicated *infra* in discussion of the applicable substantive law.

---

[2] The court has no obligation to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment.  *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).  Rather the nonmovant must identify evidence in the record and demonstrate how it supports his claim.  *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

Title 42 U.S.C. § 1983[3] provides a remedy to a party who, as the result of state action, suffers a derivation of his rights privileges or immunities secured by the Constitution and the laws of the United States. *White v. Thomas*, 660 F.2d 680, 683 (5th Cir. 1981).  Thus to state a claim under the statute, a plaintiff must prove (1) a violation of the United States Constitution or federal law; and (2) that the violation was committed by one acting under color of state law.  *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 251-53 (5th Cir. 2005).

A claim for denial of constitutionally adequate medical care to a pretrial detainee arises from deprivation of substantive due process under the Fourteenth Amendment.  *Gutierrez v. City of San Antonio*, 139 F.3d 441, 452 (5th Cir. 1998), *citing Brothers v. Klevenhagen*, 28 F.3d 452, 255-56 (5th Cir. 1994); *Fields v. City of South Houston*, 922 F.2d 1183, 1191 (5th Cir. 1991).  The Fifth Circuit applies the same standard for assessing constitutional claims of denial of medical care to pretrial detainees under the Fourteenth Amendment as it does for denial of medical care to

---

[3] Section 1983 provides in relevant part,

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

convicted inmates under the Eighth Amendment.[4]  *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001), *cert. denied*, 534 U.S. 1136 (2002).  Garza's claim of denial of medical care as a pretrial detainee therefore falls under the Fourteenth Amendment, and not the Fourth, Fifth or Sixth Amendments and technically not the Eighth Amendment.  Thus Garza's claims under amendments other than the Fourteenth are dismissed.

     In this action Garza expressly sues the individual jailers, deputies and medical personnel only in their official capacities.  "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which the officer is an agent.'"  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)(quoting *Monell v. Dep't of Social Services*, 436 U.S. 658, 690 n.55 (1978)).  A suit against a municipal official in his official capacity is no different from a suit against the municipality itself.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  Thus Garza's claim is properly brought against only Defendant Harris County.  *Graham*, 473 U.S. at 167 n.14 ("There is no longer a need to bring official-capacity actions against local government officials, or under *Monell*, . . . local government units can be sued directly.");  *Castro v. Romero,* 256 F.3d 349, 355 (5th Cir. 2001)(dismissal of claim against officers in their official

_____

     [4] The Eighth Amendment's prohibition against cruel and unusual punishment forbids deliberate indifference to the serious medical needs of prisoners.  *Estelle v. Gamble*, 429 U.S. 97 (1976).

capacity is appropriate when the "allegations duplicate claims against the respective governmental entities themselves").

Municipalities are considered "persons" that may be sued directly under § 1983. *Monell*, 436 U.S. at 694. "A municipality cannot be vicariously liable for the constitutional torts of its employees or agents." *Gros v. City of Grand Prairie*, 181 F.3d 613, 615 (5th Cir. 1999), *citing Monell*, 436 U.S. at 694. "A municipality is liable only for acts attributable to it through some official action or imprimatur." *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010). To sue a municipality or local government under § 1983, a plaintiff must demonstrate (1) a policymaker, (2) an official policy, and (3) a violation of constitutional rights whose "moving force" is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir.), *cert. denied*, 534 U.S. 820 (2001); *Monell*, 436 U.S. at 578. An official policy is "(1) [a] policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom lawmakers have delegated policy-making authority; or (2) [a] persistent, widespread practice of officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom

that fairly represents the municipal policy.[5]  Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)(*en banc*).  "[I]solated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski*, 237 F.3d at 578.  A plaintiff may establish a custom or policy based on an isolated decision only when made by an authorized policymaker in whom final authority rested concerning the action ordered because then it is the policy of the municipality.[6]  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123-25 (1988)("only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability"); *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984), *cert. denied*, 472 U.S. 1016 (1985); *Brown v. Wichita County, Tex.*, No. 7:05-CV-108-0, 2011 WL 1562567, *6 (N.D. Tex. Apr. 26, 2011).  Furthermore a "handful" of instances do not

---

[5] "[W]here prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" *Peterson v. City of Fort Worth, Texas*, 588 F.3d 838, 850 (5th Cir. 2009), *quoting Webster*, 735 F.2d at 842.  "A pattern . . . requires 'sufficiently numerous prior incidents,' as opposed to isolated instances." *Id., quoting McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989).

[6] Whether an official has "final policymaking authority" is a question of state law.  *Praprotnik*, 485 U.S. at 123.

-11-

constitute a pervasive custom or practice. *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002)(finding that eleven incidents of warrantless searches of residences by the Houston Gang Task Force did not establish a "persistent widespread practice" or an unwritten municipal custom), *cert. denied*, 537 U.S. 1110 (2003).

Pretrial detainees may assert constitutional challenges under either of two theories: "condition of confinement" or "episodic act or omission." *Scott v. Moore*, 114 F.3d 51, 53 & n.2 (5th Cir. 1997)(*en banc*), *citing Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644-45 (5th Cir. 1996)(*en banc*).

In a "condition of confinement" case, the plaintiff attacks general jail conditions, practices, rules or restrictions that plaintiff must show amount to punishment and are not incident to some other legitimate governmental purpose. *Id.; id.* To reach the level of impermissible punishment, the condition must be "arbitrary or purposeless" or "not related to a legitimate goal." *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). *See also Scott*, 114 F.3d at 53 (In a "conditions of confinement" case, a constitutional violation arises only when the complained of condition is not reasonably related to a legitimate, non-punitive governmental objective.). Isolated examples are insufficient to demonstrate a constitutional violation; "a pretrial detainee  must "demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of

the detainee's Due Process rights." *Shepherd v. Dallas County*, 591 F.3d 445, 454 (5th Cir. 2009).  "A condition is usually the manifestation of an explicit policy or restriction:  the number of bunks per cell, mail privileges, disciplinary segregation, etc.," and official intent need not be shown, but is presumed. 453-54. *Id., citing Scott v. Moore*, 114 F.3d at 53 n.2.  Sometimes the condition represents an implied or *de facto* policy, as shown by a "pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials." *Id., citing Hare*, 74 F.3d at 645.  "Proving a pattern is a heavy burden, one that has rarely been met in our caselaw." *Id.*

Where a plaintiff cannot prove "the existence of an officially sanctioned unlawful condition," he alternatively may make an "episodic-acts-or-omissions" claim by alleging specific acts or omissions by particular jail officials. *Shepherd*, 591 F.3d at 452. In such claims, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Scott*, 114 F.3d at 53.  In the episodic-act-or-omission case, the plaintiff must prove intent of the jail official or officials involved, specifically that with "deliberate indifference to the

-13-

detainee's needs" the jail official acted or failed to act.  *Hare*, 74 F.3d at 648; *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999)("To succeed in holding a municipality liable, the plaintiff must demonstrate a municipal employee's subjective indifference and additionally that the municipal employee's act 'resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the [plaintiff's] constitutional rights.'")(*citing Hare*, 74 F.3d at 649 n.14).   In other words the plaintiff must show that the state official knew of and disregarded an excessive risk to the inmate's health or safety. *Gibbs*, 254 F.3d at 549.   The Court concludes that Garza's lawsuit is an episodic-act-or-omission case:   he complains of specific omissions in his medical treatment by several jail employees acting with subjective indifference resulting from a municipal policy or custom that was adopted or maintained by the County with objective deliberate indifference to the detainee's constitutional rights, which he claims caused his stroke.

To satisfy the deliberate indifference standard, a plaintiff must show that the defendant was deliberately indifferent "'to the known or obvious consequences' that constitutional violations would result." *Id.* at 580, *citing Board of County Commissioners of Bryan County, Okl. v. Brown*, 520 U.S. 327, 220 (1986).   Deliberate indifference is a subjective standard that requires that "the official must both be aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 648–49 (5th Cir. 1996).  Thus to be liable, a plaintiff must demonstrate that the official knows of and disregards an excessive risk to the detainee's health or safety.  *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).  A plaintiff need not show that the prison official believed that harm would actually occur, but only that the official acted or failed to act despite his knowledge of a substantial risk of harm.  *Hinojosa v. Johnson*, 277 Fed. Appx. 370, 374 (5th Cir. 2008), *citing Farmer*, 511 U.S. at 842.  The plaintiff may show the official's knowledge of the risk by circumstantial evidence, e.g., by showing that the risk was so obvious that the official must have known about it.  *Hinojosa*, 277 Fed. Appx. at 374, *citing Johnson v. Johnson*, 385 F.3d 503, 524 (5th Cir. 2004).

For denial of medical care, under the "extremely high standard" of deliberate indifference the plaintiff "must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs"; "an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference." *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001); *cited for that proposition, Kavanaugh v.*

-15-

*Boyd*, Civ. A. No. H-09-2882, 2011 WL 679786, *10 (S.D. Tex. Feb. 8, 2011) "'Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference.'" *Id.* ("Deliberate indifference is especially difficult to show when the inmate has been provided with ongoing medical treatment."), *quoting Gobert v. Caldwell*, 463 F. 3d 339, 346 (5th Cir. 2006). "A decision not to provide additional or different treatment 'is a classic example of a matter for medical judgment' rather than a basis for an Eighth Amendment claim." *Id., quoting Estelle v. Gamble*, 429 U.S. 97 (1976)). "'Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs.'" *Id., quoting Norton v. Dimizana*, 122 F.3d 286, 292 (5th Cir. 1997). The prison official may avoid liability by demonstrating that he "responded reasonably to the risk, even if the harm ultimately was not averted." *Hinojosa*, 277 Fed. Appx. at 374*, citing Farmer*, 511 U.S. at 844. Simple or even heightened negligence is insufficient to establish deliberate indifference. *Farmer*, 511 U.S. at 835.

Indeed negligence and gross negligence do not implicate the Constitution and thus cannot provide a basis for a § 1983 claim, *Farmer*, 511 U.S. at 826 ("deliberate indifference entails something more than mere negligence"). "[T]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss or injury to life, liberty or property." *Daniels v. Williams*,

474 U.S. 327, 328 (1986).   Allegations amounting to negligent medical care cannot support a claim under § 1983; delay in medical care can only constitute a violation under the Eighth Amendment (and thus the Fourteenth Amendment) if there has been deliberate indifference causing substantial harm.   *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).   Moreover Garza's claims of negligence and gross negligence against Harris County do not meet the limited waiver of sovereign immunity under the Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code § 101.021.[7]   Therefore Garza's claims against Harris County for negligence and gross negligence are barred by sovereign immunity and are dismissed. *See, e.g., Anderson v. Dallas County, Texas*, 286 Fed. Appx. 850, 863 (5th Cir. 2008).

---

[7] Section 101.021 provides,

> A governmental unit in the state is liable for:
> (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:
>> (A) the property damage, personal injury or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and
>> (B) the employee would be personally liable to the claimant according to Texas law; and
> (2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

In addition to compensatory damages, Garza seeks exemplary damages against Harris County on his claims under § 1983. In *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981), the Supreme Court held that punitive damages are not recoverable against a municipality in a § 1983 suit. Thus Garza's claim for exemplary damages is also dismissed.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). "A municipality's culpability for deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id., citing Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985)("[A] 'policy' of inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.").

To establish municipal liability under § 1983, a local government's failure to train its employees in the particular conduct in dispute must amount to "deliberate indifference to the rights of person with whom the [untrained employees] come into contact." *Connick*, 131 S. Ct. at 1359, *citing City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Only if it meets this requirement does it constitute a city policy or custom under the statute. *Id.* at 1359-60*, citing id.* at 389. "[W]hen city

policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 1360. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* "The city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" *Id.,* *citing Canton*, 489 U.S. at 395.

Usually a plaintiff must show a pattern of similar constitutional violations by untrained employees to prove deliberate indifference for purposes of a failure-to-train claim. *Id.* A local government's failure to train municipal employees may qualify as a "policy," but only when it "reflects a 'deliberate' or 'conscious' choice by a municipality" to proceed in a course of action chosen from among various alternatives by relevant officials. *Canton*, 489 U.S. at 389; *Connick*, 131 S. Ct. at 1360, *citing Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986).

In *Canton* the Supreme Court suggested that "in a narrow range of circumstances" a single incident might be sufficient to demonstrate deliberate indifference where the unconstitutional

consequences of a failure to train would be so obvious and so predictable that a proof of a pattern of previous violations would not be necessary to impose liability. *Connick*, 131 S. Ct. at 1361 and 1363, *citing Board of Comm'rs of Bryan Cty.*, 520 U.S. 397, 409 (1997), and *Canton*, 489 U.S. at 390. *See Brown v. Bryant County, Okl.*, 219 F.3d 450, 460-61 (5th Cir. 2000)("[T]o hold the county liable for a single decision, there must be a high degree of predictability concerning the consequences of the challenged decision. . . . Specifically, to find the county liable for a single decision of the policymaker, there must be evidence that would support a finding that it was obvious that the offending officer in question was 'highly likely to inflict the particular injury suffered by the plaintiff.'")(*citing Bryan Cty.* 520 U.S. at 411), *cert. denied*, 532 U.S. 1007 (2001).  In *Connick*, Thompson sued the parish prosecutor's office for violating *Brady* by failing to disclose exculpatory evidence, and the jury found for Thompson. On appeal the Supreme Court reversed the verdict based on a single incident because prosecutors receive adequate training on avoiding *Brady* violations in both their general training to obtain a law degree and in studying to pass the bar to obtain a license to practice law. *Connick*, 131 S. Ct. at 1361-64.  The same might hold true in this suit for the doctors and medical professionals treating Garza for hypertension, a common medical problem, in the two jail facilities in which he was housed.

Because Garza has also not identified a policymaker or a decision by a policymaker, nor has he pointed to a formal official policy of Harris County not train its staff to provide adequate medical care to pretrial detainees, Plaintiff must show a "a persistent, widespread practice of city officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled to constitute a custom that fairly represents municipal policy." *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984), *cert. denied*, 472 U.S. 1016 (1985).  As noted, usually a pattern of similar constitutional violations by allegedly untrained employees is necessary to demonstrate a municipality's deliberate indifference for purposes of a failure to train. *Bryan Cty.*, 520 U.S. at 409.  The court must first determine whether the county's training program was adequate; if it was not, the court must then ask whether the inadequate training represented a city policy. *City of Canton*, 489 U.S. at 390.  A municipality's failure to train and/or supervise can constitute a "policy" under § 1983 if there is deliberate indifference of policymakers to an obvious need for training and supervising in light of the duties of certain officers or employees and the inadequacy in training or lack of supervision is likely to result in a violation of citizens' constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *Brown v. Bryan County, Okl.*, 219 F.3d 450, 458 (5th Cir. 2000), *cert. denied*, 532 U.S. 1007

(2001).   The  failure  to  train  must  reflect  a  deliberate  or
conscious  choice  by  a  municipality.   *City of Canton*,  489  U.S.  at
389.   "[T]he  focus  must  be  on  adequacy  of  the  training  program  in
relation  to  the  tasks  the  particular  officers  must  perform.   That
a  particular  officer  may  be  unsatisfactorily  trained  will  not  alone
suffice  to  fasten  liability  on  the  city,  for  the  officer's
shortcomings  may  have  resulted  from  factors  other  than  a  faulty
training  program . . . for  example,  that  an  otherwise  sound  program
has  been  negligently  administered."   *Id.* at  390-91.   Nor  is  a
claim  that  "an  injury  or  accident  could  have  been  avoided  if  an
officer  had  had  better  or  more  training,"  because  such  an  argument
"could  be  made  about  almost  any  encounter  resulting  in  injury";
even  adequately  trained  officers  err  and  such  a  claim  does  not
prove  the  training  program  was  inadequate.   *Id.* at  391.   For
municipal  liability  to  attach,  a  deficiency  in  a  city's  training
program  must  have  caused  the  two  jails'  staffs'  deliberate
indifference  to  Garza's  medical  condition.   *Id.*

**IV.  Harris County's Motion for Summary Judgment (#13)**

Garza's  arrest  on  December  27,  2007  was  the  ninth  time  he  was
incarcerated  in  the  Harris  County  Jail,  the  first  arrest  occurring
in  1992.   Plaintiffs  Dep.,  #13,  Ex.  A,  at  pp.  24,  27,  33,  36,  39,
42,  45,  47,  57,  71,  and  79-80.   With  copies  of  a  deposition  from
Plaintiff,  another  deposition  and  an  affidavit  (with  Garza's
medical  records  attached)  from  Harris  County  Executive  Director  for
Health  Services  and  custodian  of  the  Sheriff's  Office  inmate
medical  records  Michael  Seale,  M.D.,  whose  duty  was  to  oversee  all

medical operations for the Harris County Jail system, three other affidavits, medical records, and documents containing Harris County's policies and procedures in support of its motion, Harris County argues that its evidence shows there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

Harris County's evidence details how Plaintiff was treated medically and what the medications he received during his detainment in two Harris County jail facilities and at LBJ Hospital during the period in dispute, in particular from his arrest on December 27, 2007 through his stroke on March 10, 2008 and hospitalization on March 11, 2008.

According to his deposition and affidavit testimony, Dr. Seale's duties include policy review and development for all health services provided through the Harris County Jail and oversight of all physician, nurse practitioner and nursing practices in the jail, insuring compliance with the health services components of the jail standards as regulated by the Texas Commission on Jail Standards ("TCJS"), and continued accreditation by the National Commission on Correctional Health Care Standards for Health Services ("NCCHC *Standards*"). #13-2, Ex. B t 7-8; #13-3, Ex. C, at 1-2.  He is a qualified expert in the field of medicine, is a custodian of inmate medical records, and often reviews these records to determine medical care received by inmates. *Id.* at 4. He has reviewed the medical records of Oscar Garza through his nine stays in the Harris County Jail and identified the following entries relevant to this action and to the County's official procedures and policies involved in Garza's medical care.

After Garza was arrested and booked into the Harris County Jail on December 29, 2007, pursuant to jail procedure Garza was screened by the Inmate Processing Center Nurse at 10:52 p.m.  #13-

3, Ex. C at 5.[8]   His blood pressure then was 182/100, and he
informed the nurse that he had a history of hypertension and needed
multiple medications.  I*d*.  Garza was sent on to see a physician
because of his elevated blood pressure.  #13-2 at 14.  Inmates are
not permitted to bring medication from outside into the jail.  *Id*.
at 15.  At 2:52 a.m on December 28, 2007, within four hours of his
initial screening, with a blood pressure reading of 196/111 he saw
a physician in the jail clinic who prescribed a .2 milligram dose
of Clonidine and a repeat blood pressure in approximately an hour.
#13-3, Ex. C at 5; #13-3, Ex. B at 16-17.  At 5 a.m. his blood
pressure reading was 174/113.  *Id; id*. at 18.  Because it was still
high, the physician gave him another dose of Clonidine.  At 6:27
a.m. his blood pressure was recorded as 144/113.  *Id.; id*. at 19.
Another entry that same day indicated it was 171/97.  The physician
noted there were no chest pains, no shortness of breath, no lower
extremity edema, no vision changes, no change in gait, a normal
result from a head, eyes, ears, nose and throat examination, clear
lungs, regular heart beat and rhythm, although the patient had a
headache.  The doctor ordered another medication, Norvasc, 10
milligrams by mouth daily and blood pressure checks twice a day for
three days, and gave Garza Tylenol.  *Id.; id*. at 20.

      The next day, December 29, 2007, Garza's blood pressure was
measured as 182/106.  *Id.; id*. at 21.  A physician ordered a
diuretic, hydrochloric thiazide ("HCTZ") once a day, an aspirin a
day, and another blood pressure check in an hour.  *Id.; id*. at 21.
A re-check of his blood pressure showed it to be 142/92.  *Id*. at 6;

_____

      [8] Dr. Seale testified at deposition that the medical screening
is mandatory for all who have not bonded out or left for other
reasons.  At the screening a registered nurse asks a set of
questions designed to identify any chronic or acute medical or
mental health needs, takes the inmate's vital signs (blood
pressure, heart rate, respiratory rate and temperature), and does
a chest x-ray to check for active tuberculosis.  #13-2 at 11-13.

id. at 22.  On December 31, 2007 Garza signed for receipt of keep-on-person ("KOP") medications (Capropril and HCTZ) and non-KOP Clonidine.[9]  Although Garza returned to the clinic on January 7, 2008 with a high blood pressure reading of 171/113, it was brought under control to 126/88 with these medicines and he was able to be released from the clinic the same day.  #13-3, Ex. C at 6.

As a regular Harris County Jail procedure, every inmate undergoes a fourteen-day health assessment.  #13-2, Ex. B at 23. Garza's took place on January 8, 2008 and involved a history and physical performed by a nurse that was then reviewed by a physician.  Id. at 24; #13-3, Ex. C at 6.  The nurse noted a history of high blood pressure since 2001, a history of a stroke, diagnosed in 2007, a list of the patient's medications, an alcohol habit of a 12-pack per day, use of cocaine, marijuana, and occasional tobacco, and the statement, "Blood pressure elevated. Hasn't taken prescriptions today.  Instructed to take prescriptions upon return to cell."  The nurse documented two blood pressure readings:  152/100 and 154/98.  Id. at 24; id. at 6.  Plaintiff's records reveal that his blood pressure was checked again on January 10, 2008 (120/80), January 11, 2008 (115/86), January 12, 2008 (98/66), and January 13, 2008 (106/70).  #13-3, Ex. C at 6.  On February 27, 2008 Garza signed for receipt of Captopril, ECASA and HCTZ for a thirty-day supply.  Id.  On March 3, 2008 the order of Clonidine was renewed for 30 days.  Id. at 7.  The MAR indicates Garza received medication through March 7, 2008, but not on March

---

[9] The Harris County Jail has different procedures for two types of medicines:  "keep-on-person" ("KOP") medications, which are given to the detainee in bottles over which the detainee has physical control and the responsibility to take the medications as the physician instructs, and non-keep-on-person ("non-KOP") medications, which are administered by nurses from medication carts, with each dose documented in a Medication Administration Record ("MAR") as given or not given.  #13-3, Ex. C at 7; #13-2, Ex. B at 24-25.

8-10, 2008 after he was transferred to the 701 jail. *Id.* at 7, 8.

On March 10, 2008 Garza collapsed in his cell and was brought to the clinic for a physician evaluation. *Id.* at 7. His chart indicates that he had not received his medication for three days, that he had suffered from a headache all day, and that about two hours earlier he had felt numbness in his left arm and leg. *Id.* He was given medication and taken by ambulance to LBJ Hospital.

Harris County demonstrates that it had several relevant official policies and practices.

For instance, a policy of the Health Services Division of the Harris County Sheriff's Office is to provide information to inmates on arrival in both writing by the Sheriff's Office Inmate Handbook and verbally by the intake screening nurse about how to access medical care. #13-6, Ex. F (Affidavit of Bobby D. Davis, Medical Administrator of the Harris County Sheriff's Office Health Services Division). As explained in section J-E-07 of the Health Services Manual (#13-6), inmates have access to sick call request slips, which they fill out, which are then placed in a locked box and picked up by a Health Services Division member during the night shift, and which are evaluated daily by the health care providers for immediacy of need and required intervention. The information on the slips is recorded onto Triage Logs that are maintained for each jail location and cellblock. #13-6. The Triage Logs for Garza's cellblock from January 1, 2008 through March 8, 2008 do not reflect any sick call requests from Garza. #13-6, Ex. B. Harris County's policy or practice requires any sick call requests from an inmate to be noted in his medical records; from December 27, 2007- March 10, 2008 Garza's medical records do not show any sick call requests nor that any employee from the Health Services Division or the Sheriff's Office generally had knowledge that Garza had any emergent issues regarding immediate medical intervention that were not addressed or responded to. #13-6. Furthermore, as Plaintiff

-26-

concedes in his deposition, he was familiar with the sick call request slips from previous incarcerations when he had employed them (e.g., #13-1 at 32-22).

As another example, the Harris County Sheriff's Office Standard Procedures for 701 Detention Command requires all staff members working with the inmates to document and record all noteworthy information in a "Pass-On-Book" located in each work area or post for each watch. Documentation of an inmate's "making an outcry" regarding emergency medical concerns and need or treatment would be noted. #13-5, Ex. E (Lt. Ronny Taylor Affid.), Ex. 2 (copies of excerpts of the relevant Pass-On-Book, which do not show any entry or information about Garza for March 8th or 9th; on March 10th at 11:30 p.m. an entry states that he fell out of his bunk and claimed he could not walk).

Procedure 2.2 of Harris County Sheriff's office Manual of Policies and Procedures for Nursing Services (copy attached to Seale's affidavit, #13-3, Ex. C, Ex. 2) states, "Medication nurses will ascertain if the patient, having missed one dose of narrow therapeutic range medication, has been released from custody or transferred to another cellblock or facility.  If transfer has occurred, the nurse will ensure the MAR and medication is noted with proper location and transferred to the appropriate cart." Thus when Garza was transferred to the 701 jail, the individual nurse should have determined his location after completing the nurse's medication delivery rounds and finding he has been transferred. #13-3, Ex. C. at 8. Harris County concedes, "It does not appear that the policy was followed in this circumstance based on the absence of documentation on the MAR for March 8, 9, and 10 following the Plaintiff's transfer," but attributes noncompliance to negligence  #13 at 8, citing *id.*  Harris County insists that there is no evidence that any of its jail  staff who dealt with Plaintiff's medical problems had actual awareness or knowledge that

Plaintiff would experience a life-threatening event and thus no evidence that it acted with deliberate indifference. Nor has Plaintiff shown that the alleged acts or omissions resulted from a Harris County policy or custom, adopted or maintained with objective deliberate indifference to Garza's constitutional rights.

Moreover Harris County insists it had proper medical care policies and procedures in place. It participates in and has fully satisfied various performance evaluations. The Medical Division maintains a Comprehensive Continuous Quality Improvement Program involving annual audits of Harris County Jail's inmates' access to care, nursing care, pharmacy services, diagnostic services, emergency care, etc. #13 at 10, citing #13-6 Ex. F and F(A) and section J-A-06 of the Manual (#13-6(A)). The Health Services Division employs approximately 200 full time and 200 temporary health care staff to provide routine and emergent care to inmates 24 hours a day, 7 days a week. *Id.* Since 1985 it has maintained continuous accreditation through external peer review from the National Commission on Correctional Health Care, the premier national accrediting agency for health services in jails, prisons and juvenile confinement facilities, and met the Commission's *Standards for Health Services in Jails.* Seale's Affid., #13-3, Ex. C at 2-3. Harris County maintains that this accreditation validates its position that it goes beyond minimum constitutional standards. Finally in 2007 and 2008 Harris County Jail system passed the annual state jail inspection by the Texas Commission on Jail Standards.

### V.  Plaintiff's [Response][10] (#18)

After reiterating a number of his complaint's allegations, Garza submits an affidavit from Alvin M. Cotlar, M.D., F.A.C.S., a licensed, practicing physician, board certified in surgery, who

---

[10] The document is incorrectly labeled a "Reply."

states that his information and opinions are "based on my line-by-line review of Mr. Oscar Garza's medical record documented during his incarceration in the Harris County Jail, Harris County, Texas, from admission to release." #18, Ex.  He reiterates the details of Garza's medical history during his detention, discussed *supra*, emphasizing Garza's "dangerously high BP and a history of long-standing treatment for this malady," that Garza had had a stroke a few years before, that "[h]is blood pressure on admission required multiple drugs to control, and it was imperative that his BP medication be administered without interruption and in correct doses to prevent recurrent complications, including a stroke." *Id.* His affidavit states the following relevant points:

> A patient with a history of a stroke and suffering from hypertension, on medication for hypertension, who is admitted to a facility, jail, prison or even a hospital (for an unrelated condition) is in a dangerous medical situation in the event he does not receive his anti-hypertensive medication.  By history, Mr. Garza's previous stroke was due to hypertension.  It is the responsibility of the <u>medical staff</u> in charge of Mr. Garza's care to ensure (1) that they confirm that medications have been used to control high blood pressure (2) that the medication is given to the patient by the attendant on a schedule established by a physician as appropriate to keep the blood pressure normal (3) to monitor the blood pressure at regular intervals to ensure that the dosage of the medication and times of administration are effective.  Expecting the patient to take his medication without being given the medication by a nurse, technician, or attendant, at each authorized time, is inappropriate and not within a facility's or any medical treatment program's standard of care.  Patients will invariably forget to take their medication or take it at irregular intervals such that the blood pressure will not be controlled.  At times the patient will not take the medication because they perceive it is having an adverse effect or is unnecessary.
>
> The patient is not in position to monitor his need for the medication because he would need to self-document his BP at various regular intervals.  Patients may have extremely elevated BPs and not have headache or other symptoms related to the high BP.  Unless a patient has

his own BP machine and is knowledgeable as to what
results are ominous, the self-administration is totally
inappropriate.  Circumstances concerning the environment
and the individual, such as Mr. Garza, cause the concept
of giving him the responsibility  of taking his own BP
medication to border on the ridiculous.  He should never
be expected to ask for BP medication based on his own
perception of need.  As seen in this case, the gap in
administration of BP medication resulted in severe,
debilitating stroke.  Mr. Garza did not receive his BP
medication on March 8,9,10, resulting in headaches on the
third day without medication and then developed classic
signs of a stroke which was caused by this gap in
treatment.
     . . . The jail officials including the medical staff
were well aware of the necessity to continue his
treatment with BP medicine, which had been effective in
controlling high elevated blood pressure.  The fact that
they held back his critical medication from him is
clearly "indifference" and must be "deliberate" since it
couldn't be "accidental" for three days.  There was
substantial documentation of the necessity for the
medical staff to give him anti-hypertensive medications.
Not recognizing this and ignoring the potential disaster
that could result[] is clearly "indifference."  "Concern"
rather than "indifference" would have been demonstrated
by personnel reviewing the inmate's medical record,
identifying his on-going medication requirements, and
ensuring he received the medication.

#18, Ex. (Cotlar Affid.).

## VI.  Court's Ruling

After reviewing the record and the applicable law, the Court

concludes that Harris County's motion for summary judgment should

be granted.  "Deliberate indifference is an extremely high standard

to meet."  *Domino*, 239 F.3d 756.  Defendant's competent summary

judgment evidence[11] shows that pretrial detainee Garza was not the

---

[11] Although his representation of his medical treatment differs
from that indicated in his records, Garza does not expressly
claim that his medical records were falsified or manipulated and

victim of "deliberate indifference" to his serious medical needs as defined by the case law construing § 1983 and the Fourteenth Amendment.  Moreover Plaintiff has failed to raise a genuine issue of material fact for trial.

There is no disagreement here that Garza's hypertension, especially in light of his long history with it, including a previous stroke, was a serious, indeed life-threatening condition that required multiple medications and regular monitoring. Nevertheless, Harris County has produced his medical records indicating that up until March 8, 2008 when he was transferred to the 701 jail it provided him with timely examinations by physicians and nurses a number of times between his less-than-three-months' stay prior to his stroke, a correct diagnosis, and multiple medications that were appropriately changed or dosage modified

---

are inaccurate.  Even if he did, the Fifth Circuit requires such a claim to be supported by facts.  *Mathis v. Alexander*, 49 F.3d 728, No. 94-40757, 1995 WL 103646, *4 (5th Cir. March 3, 1995). Conclusory allegations that medical records have been falsified are insufficient to defeat a motion for summary judgment. *Knighten v. Ott*, 69 Fed. Appx. 657, No. 02-41163, 2003 WL 21355964,  (5th Cir. May 21, 2003)(conclusory allegations that prisoner's "medical records were falsified is insufficient to defend medical defendants' summary-judgment evidence or to create a genuine issue of material fact").  *See also Howe v. Polunsky Unit*, No. Civ. a. 9:08CV142, 2010 WL 5640804 *8 (E.D. Tex. Nov. 30, 2010); *Boone v. Buchanan*, No. Civ. A. 6:07CV242, 2008 WL 744247, *15-16 (E.D. Tex. Mar. 19, 2008)("The claim that the medical records have been falsified is not itself a constitutional violation"); *Carter v. McMeely*, 24 F.3d 236, No. 93-3591, 1994 WL 242624, *2 (5th Cir. May 16, 1994)(finding Carter did not present "any evidence creating a genuine issue on the question whether his medical records were altered.").

until the hypertension was brought under control.  Garza fails to
produce evidence demonstrating that the jail staff "refused to
treat him, ignored his complaints, intentionally treated him
incorrectly, or engaged in any similar conduct that would clearly
evince a wanton disregard for serious medical needs." *Domino*, 239
F.3d at 756.

 Dr. Cotlar's affidavit's assertion that the medical staff was
"deliberately indifferent" to Garza's dangerously high blood
pressure is not based on the same standard as that required under
§ 1983 and the Fourteenth or Eighth Amendments.  Cotlar's use of
the term suggests it is akin to medical malpractice, negligence or
gross negligence.[12]   Moreover the staff had been providing the

---

[12] For example, he states, "It is the responsibility of the
<u>medical staff</u> in charge of Mr. Garza's care to ensure (1) that
they confirm that medications have been used to control high
blood pressure (2) that the medication is given to the patient by
the attendant on a schedule established by a physician as
appropriate to keep the blood pressure normal (3) to monitor the
blood pressure at regular intervals to ensure that the dosage of
the medication and times of administration are effective."  He
adds, "There was substantial documentation of the necessity for
the medical staff to give him anti-hypertensive medications.  Not
recognizing this and ignoring the potential disaster that could
result[] is clearly "indifference."  "Concern" rather than
"indifference" would have been demonstrated by personnel
reviewing the inmate's medical record, identifying his on-going
medication requirements, and ensuring he received the
medication."

 Cotlar asserts that in his opinion, "Expecting the patient
to take his medication without being given the medication by a
nurse, technician, or attendant, at each authorized time, is
inappropriate and not within any facility's or any medical
treatment program's standard of care. . . . Circumstances
concerning the environment and the individual, such as Mr. Garza,
cause the concept of giving him the responsibility of taking his

precise services Cotlar required until Garza's transfer to the 701 jail, when apparently the medical monitoring and his access to medication lapsed for two to three days when the nurse on the medicine cart on March 8, 2008 failed to follow Procedure 2.2 of the Sheriff's Office Manual of Policies and Procedures, i.e., to "ascertain if the patient, having missed one dose of narrow therapeutic range medication, has been released from custody or transferred to another cellblock or facility.  If transfer has

---

own BP medication to boarder on the ridiculous.  He should not be expected to ask for BP medication based on his own perception of need."

Differences of opinion about medical treatment among physicians do not state a claim for deliberate indifference to medical needs.  *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997).  Case law demonstrates that provision of some KOP medication for immediate relief and of non-KOP medication for more potent and dangerous drugs was an accepted regular practice in Texas County jails.  *See, e.g., Senegal v. Hamilton,* No. A-10-CA-534-LY, 2011 WL 2442871, *5 (W.D. Tex. June 14, 2011)(summary judgment evidence showed that the "medical staff regularly monitored Plaintiff's vital signs, prescribed medication to maintain a healthy blood pressure, and took him to the hospital when he complained of chest pains. . . . Plaintiff was prescribed multiple medications to treat his blood pressure, and had blood pressure medication give to him to keep on his person at the time that his blood pressure began to escalate.")*; Alexander v. Kukua*, C.A. No. C-10-325, 2011 WL 489837 (S.D. Tex. July 16, 2011); *Mendenhall v. Wilson*, No. 5:07CV44, 2010 WL 958043 (E.D. Tex. Feb. 19, 2010), *adopted*, 2010 WL 958060 (E.D. Tex. Mar. 12, 2010); *Minix v. Blevins*, Civ. A. No. 6:06cv306, 2007 WL 1217883 (E.D. Tex. Apr. 23, 2007); *Buffin v. Bowles*, No. 3:99-CV-1386-H, 2000 WL 1274003, *4 (N.D. Tex. Sept. 6, 2000).  The Court has been unable to find any case finding that this method of medication distribution is unconstitutional, and Plaintiff does not cite any authority for such a proposition.  As noted, Harris County has provided evidence that its medical treatment program has been regularly reviewed, accredited and approved by highly regarded investigative entities.

occurred, the nurse will ensure the MAR and medication is noted with proper location and transferred to the appropriate cart." #13-3, Ex. C, Ex. 2.  Regardless, Plaintiff fails to allege facts demonstrating, no less prove, that she acted with deliberate indifference, that her failure was intentional rather than merely negligent, or that her omission was a regular practice or procedure in the jail of which Harris County was actually or constructively aware.  Indeed Harris County's express policy was to the contrary. "[T]he fact that one nurse might not have followed this custom [or policy] does not establish an unconstitutional policy." *Buffin v. Bowles*, No. 3:99-CV-1386-H), 2000 WL 1274003, *3 (N.D. Tex. Sept. 6, 2000).  Malpractice or negligence is not grounds for a constitutional claim. *Vornado v. Collins*, 920 F.2d 320, 319-20 (5th Cir. 1993).  A prison official is deliberately indifferent to serious medical needs if he intentionally denies or delays access to medical care.  *Walker v. Butler*, 967 F.2d 176, 178 (5th Cir. 1992).  An inadvertent failure to provide adequate medical treatment does not violate the Eighth, and therefore the Fourteenth, Amendment.  *Estelle v. Gamble*, 429 U.S. at 463-65. Cotlar's affidavit does not show that the staff *consciously* disregarded a substantial risk of serious harm nor does it even mention the circumstance of Garza's transfer.

Moreover, even if Garza had shown a constitutional violation of deliberately indifferent denial or delay of medical care, he has

not shown that a policy, practice or custom of Harris County was the moving force behind the violation.  Harris County has provided evidence of its official policies and practices regarding medical care for its inmates and of its provision of adequate care.  Garza has not identified any policymaker for the County no less alleged any policy that he initiated.  Nor has Garza  alleged, no less supported with summary judgment evidence, any pattern or custom of Harris County Jail employees' treatment of other inmates similar to that allegedly inadequate medical care accorded to him, no less that Harris County had actual or constructive knowledge of such a custom or practice.

Garza's failure-to-train claim, i.e., that Harris County failed to train its jail staff about administration and monitoring of the administration of medication to inmates, is conclusory.  He fails to plead, no less support with summary judgment evidence, any instances of improper administration of medicine to inmates besides himself, nor any facts about Harris County's training program.  Nor does he allege, no less demonstrate, that any individual Harris County medical employee was highly likely to deny another hypertensive inmate blood pressure medication and cause him to have a stroke.  Nor does he allege facts, no less offer proof, that Harris County had actual or constructive knowledge of such a problem.  In sum, he presents no summary judgment evidence to support his failure-to-train claim.

Accordingly, for the reasons stated above, the Court

ORDERS that Harris County's motion for summary judgment is GRANTED.

**SIGNED** at Houston, Texas, this  7th  day of  September , 2011.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE